# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Robert E. Blackburn

Civil Case No. 08-cv-00462-REB-MEH

WILDERNESS WORKSHOP,
HIGH COUNTRY CITIZENS' ALLIANCE,
WESTERN COLORADO CONGRESS,
WESTERN SLOPE ENVIRONMENTAL RESOURCE COUNCIL,
CENTER FOR BIOLOGICAL DIVERSITY, and
BOARD OF COUNTY COMMISSIONERS FOR PITKIN COUNTY,

    Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, and
UNITED STATES FOREST SERVICE,

    Defendants,

SG INTERESTS I, LTD.,

    Intervenor-Defendant.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

**Blackburn, J.**

This matter is before me on **Petitioners' Motion and Memorandum in Support of Motion for Preliminary Injunction** [#15], filed March 20, 2008. The defendants and the intervenor-defendant filed responses [#24 & #26], and the plaintiffs filed a reply [#36].

I heard the motion on April 17, 2008. I heard oral argument. The parties did not present testimony or other evidence. Rather, pursuant to their stipulation and with my approbation, they relied on the evidence presented with their briefs. *Parties' Stipulated Agreement Regarding Preliminary Injunction Hearing* [#34], filed April 15, 2008. I deny

the plaintiffs' motion for preliminary injunction.

## I. JURISDICTION

I have jurisdiction over this case under 28 U.S.C. § 1331 (federal question).

## II. BACKGROUND

On January 8, 2008, the Bureau of Land Management (BLM) and the Forest Service issued a Record of Decision (ROD) authorizing the issuance of rights of way and temporary use permits to the intervenor-defendant, SGI Interests I, LTD (SGI). *Motion for preliminary injunction* [#15], filed March 20, 2008, Exhibit 3 (ROD). The ROD permits SGI to construct a natural gas pipeline on public lands. The pipeline is referred to as the Bull Mountain Pipeline.

In their complaint the plaintiffs allege that the decision reflected in the ROD violates two provisions of federal law. First, the plaintiffs claim that the ROD violates a rule adopted by the Forest Service which is known as the "roadless rule." 66 Fed. Reg. 3244 - 3273. Second, the plaintiffs claim that the ROD violates the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 - 4370f. The plaintiffs allege that the ROD violates NEPA because the Final Environmental Impact Statement (FEIS) on which the ROD is based failed to consider certain connected actions. *Motion for preliminary injunction* [#15], filed March 20, 2008, Exhibits 1 and 2.

Neither the roadless rule nor the NEPA provides for a private right of action. The plaintiffs seek relief for the alleged violations of the roadless rule and the NEPA under 5 U.S.C. § 706, part of the Administrative Procedure Act (APA). Under § 706, a court must invalidate actions that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The approved right of way for the Bull Mountain Pipeline would cross three areas

that are regulated by the roadless rule.  In these areas the pipeline generally would run parallel to an existing, smaller pipeline known as the Ragged Mountain Pipeline.  The Ragged Mountain Pipeline has a permitted right of way that is 20 feet wide.  The Ragged Mountain Pipeline right of way would overlap by about 10 feet the 50 foot wide right of way for the Bull Mountain Pipeline.  Construction activities are planned to occur over three years, and are limited to the period between May 1 and October 1 of each year.  Construction of the pipeline is set to begin as soon as May 1, 2008.  After the pipeline is installed, the right of way will be rehabilitated and revegetated.  However, trees will not be permitted to grow in the pipeline corridor.

### III.  STANDARD OF REVIEW

In their motion for preliminary injunction, the plaintiffs ask that I enter an order preliminarily enjoining the construction of the Bull Mountain natural gas pipeline.  A party seeking a preliminary injunction must show (1) a substantial likelihood that the movant eventually will prevail on the merits; (2) that the movant will suffer imminent and irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. **Lundgrin v. Claytor**, 619 F.2d 61, 63 (10th Cir. 1980); **Heideman v. S. Salt Lake City**, 348 F.3d 1182, 1189 (10th Cir. 2003) (irreparable injury must be imminent).   When the moving party has established that the three harm factors tip decidedly in the movant's favor, the probability of success requirement is somewhat relaxed, and the movant need only show questions going to the  merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation. **Nova Health Systems v. Edmondson**  460 F.3d 1295, 1298 n. 6 (10th Cir. 2006).

## IV. ANALYSIS

### A. Substantial Likelihood of Success on the Merits

Both of the plaintiffs' claims are brought under the Administrative Procedures Act. Under the APA a reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of judicial review is narrow and deferential:

> A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . The court is not empowered to substitute its judgment for that of the agency." The agency must articulate a "rational connection between the facts found and the choice made." [W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

**Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc**., 419 U.S. 281, 285-86 (1974) (internal citations omitted). "[A]n agency's interpretation of its own regulations . . . is entitled to great deference," and the court may reject the agency's interpretation only when it is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." **Bar MK Ranches v. Yeutter**, 994 F.2d 735, 738 (10th Cir. 1993) (citation omitted); *see* **Stinson v. United States**, 508 U.S. 36, 45 (1993). I must apply this highly deferential standard of review in determining whether the plaintiffs have demonstrated that they have a substantial likelihood of success on the merits of either of their claims.

#### 1. Roadless Rule

The roadless rule was promulgated by the Forest Service in 2001.[1] The rule

---

[1] The Forest Service revoked the roadless rule in 2005. However, the roadless rule was reinstated recently. ***See California ex rel. Lockyer v. U.S. Dep't of Agric.***, 459 F. Supp. 2d 874 (N.D. Cal 2006). The current version of the roadless rule is not included in the current version of the Code of Federal Regulations. However, the parties agree that the version of the roadless rule that is applicable to this case is found at 66 Fed. Reg. 3244 (Jan. 12, 2001).

4

provides that a "road may not be constructed or reconstructed in inventoried roadless areas (IRAs) of the national Forest System, except as provided in paragraph (b) of this section." 66 Fed. Reg. at 3272. The rule defines the term "road" as a "motor vehicle travelway over 50 inches wide, unless designated and managed as a trail." *Id*. Temporary roads are included explicitly in the definition of the word "road." *Id*.

The pipeline approved in the ROD would cross through three inventoried roadless areas that are subject to the roadless rule. The plaintiffs allege that the ROD violates the roadless rule because the ROD permits the construction of a "construction/travel lane" and a "passing lane" within the pipeline corridor for the purpose of building the pipeline and reclaiming the area after the pipeline is installed. *FEIS*, App. A, pp. 15 - 16. A variety of machinery will travel in these lanes. *FEIS*, pp. 58 - 59; App. Q, p. 114, 1.1. The plaintiffs assert that this violates the roadless rule because it constitutes the construction of a motor vehicle travelway more than 50 inches wide, which constitutes a temporary road.

The BLM and the Forest Service concluded that the construction of the pipeline will not violate the roadless rule because "(n)o permanent or temporary roads are proposed within the three IRAs affected by this proposal." ROD, p. 3. The agencies concluded that the area of surface disturbance in the right of way necessary to clear the right of way, install the pipe, bury the pipe, recontour the surface, and revegetate disturbed soil will not be used as a motor vehicle travelway because the sole reason for creating surface disturbance "will be for the purpose of accommodating motorized equipment needed to construct (the pipeline) and bring in the supplies needed to install the pipeline." *ROD*, p. 8. "When construction/reclamation equipment is located within the boundaries of an IRA, it will be confined to existing roads and to the construction

5

zone within the designated right-of-way." In short, the BLM and the Forest Service concluded that during construction, the pipeline right-of-way will be "a 'construction zone,' not a 'road,'" and that construction of the pipeline "(w)ill not result in the addition of forest classified for temporary road miles." Id. A similar interpretation of the roadless rule was upheld in **Hammond v. Norton**, 370 F.Supp.2d 226, 261 - 262 (D.D.C. 2005).

Certainly there is room for debate about whether or not certain aspects of the pipeline right of way might fall within the roadless rule's definition of the term "road" during construction of the pipeline. Here, the BLM and the Forest Service considered the roadless rule and concluded that construction of the pipeline will not result in the addition of road miles in the roadless areas. As a reviewing court, I must give the agencies' interpretation of the roadless rule due deference, and I may reject that interpretation only if it is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." **Bar MK Ranches v. Yeutter**, 994 F.2d 735, 738 (10th Cir. 1993) (citation omitted). On the current record, I conclude that the plaintiffs have not demonstrated a substantial likelihood that they can demonstrate that the BLM's and Forest Service's application of the roadless rule in this case is unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning.

2. Connected Action

The plaintiffs' NEPA claim is based on their assertion that the BLM and the Forest Service failed to consider development of gas wells as a connected action in the Final Environmental Impact Statement (FEIS) concerning the pipeline. The NEPA requires federal agencies to prepare an environmental impact statement for "all major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A federal agency must address the environmental effects of connected

6

actions within one EIS. 40 C.F.R. § 1508.25(a)(1). Actions are connected if they

> (i) Automatically trigger other actions which may require environmental impact statements.
>
> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
>
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a). Under the third test, an action is connected if it lacks "independent utility." *Custer County Action Assoc. v. Garvey*, 256 F.3d 1024, 1037 (10th Cir. 2001). The Ninth Circuit has held that actions are connected when they are "inextricably intertwined." *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985).

In the Final Environmental Impact Statement for the Bull Moutain pipeline, the agencies did not consider development of new gas wells that would be facilitated by the pipeline as connected actions. The only actions explicitly considered as connected actions in the FEIS are compressor stations at the northern and southern ends of the pipeline. *FEIS*, p. 8. The air quality analysis in the FEIS includes an analysis of potential development of gas wells that would be served by the pipeline. *FEIS*, pp. 102 - 111. SGI's plan of development "assumes that 55 to 60 [gas] wells would be drilled over a ten to twelve year period . . . ." *FEIS*, p. 115. The FEIS's air quality analysis also examined "what emissions might be at maximum pipeline capacity." *FEIS*, p. 114. "Thus, the analysis assumes that 282 additional wells could be drilled to supply" maximum pipeline capacity. *FEIS*, p. 115. The plaintiffs argue that the development of gas wells "is part and parcel of the pipeline project" and, thus, must be considered as a connected action in the FEIS.

In the FEIS the agencies outline the basis for their decision not to analyze

7

potential gas well development as a connected action. In response to a comment asserting that gas well development must be considered as a direct or indirect impact of allowing the pipeline to be built, the agencies outlined their position:

> The Proponent (SGI) notes that their development of the Bull MT lease unit may result in 55-60 wells over 10 years. Those estimates are speculative and are dependent on market conditions and other factors. This information is best addressed as potential foreseeable actions in the CEA [cumulative effects analysis] analysis. The direct action is the installation of the pipeline. The connected action that would have to happen for the use of a new pipeline is the installation of the Compressor site on private ground. The # of wells that would result on the Bull Mt lease unit or on other leases in the larger area is entirely speculative in nature.

*FEIS*, Appendix Q, p. 146, 27.2. A pipeline engineer speaking on behalf of the agencies opined in the FEIS that "drilling would likely continue and would find other alternative means of transport from the area," if the Bull Mountain pipeline is not built. *FEIS*, Appendix Q, p. 191, 36.20. The agencies expand on their rationale in response to another comment:

> To the extent possible, the agencies have included for the purposes of cumulative effects analysis the number of wells that could reasonably be serviced by the Bull Mountain pipeline. Although the presence of the Bull Mountain pipeline would create a situation in which the area is more attractive for natural gas production operations, there are no assurances that other leases in the area would be developed by drilling. Projecting number of wells based on amount of leased acreage is not meaningful because development of specific lease holds depends on gas price and demand, among many other variables. Thus, there are too many variables to predict future activities with any certainty.
>
> \*   \*   \*   \*
>
> The Air Quality resource section used a CEA [cumulative effects analysis] analysis based on maximum possible wells that could be drilled to fill the maximum capacity of a 20" line. The Proponent [SGI] notes that their plans would be for 55 - 60 wells on the bull Mt lease unit. Anything more is speculative in nature.

*FEIS*, Appendix Q, p. 189, 36.17.

Again, in resolving the plaintiffs' APA claim, I may reject the agencies' determination that potential gas well development is not a connected action under NEPA only if that determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). I must determine if the agencies considered the relevant factors and whether the decision reflects a clear error of judgment. If the agencies articulate a rational connection between the facts found and the choice made, then the decision generally must be upheld. *See, e.g., Friends of Marolt Park v. U.S. Dept. of Transp.*, 382 F.3d 1088, 1096 (10th Cir. 2004).

Based on the current record, I conclude that the plaintiffs have not demonstrated a substantial likelihood that they will succeed on their challenge to the FEIS under the NEPA. As with the roadless rule, there is room for debate about application of the relevant connected action criteria to anticipated gas well development. However, I conclude that the current record generally indicates that the agencies considered the relevant factors and made a rational determination based on those factors. The pipeline will transport gas from existing wells and could transport gas from future wells. The pipeline can exist without future well development, although that circumstance may be economically unwise. Future wells can exist without the pipeline. The FEIS considered other possible pipeline routes, and the agencies noted in the FEIS that gas from new wells "would find other alternative means of transport form the area" if the pipeline does not exist. The pipeline will not automatically trigger additional wells, drilling of additional wells can proceed without the pipeline, and the pipeline and possible additional wells are not interdependent; that is, dependent on each other. Under the applicable definition of connected action, the fact that the existence of the pipeline may encourage additional gas wells, and probably will serve any additional wells, does not mean

necessarily that additional wells are connected actions. Therefore, I conclude that the plaintiffs have not demonstrated a substantial likelihood of success on their NEPA claim.

### 3. Conclusion

On the current record, the plaintiffs have not demonstrated a substantial likelihood of success on their roadless rule claim or their NEPA claim. However, there is at least room for debate on the viability of these claims. In this circumstance further analysis is necessary. If the plaintiffs have shown that the three harm factors tip decidedly in their favor, then the probability of success requirement is somewhat relaxed, and the plaintiffs need only show questions going to the merits that are so serious, substantial, difficult and doubtful as to make them a fair ground for litigation. ***Nova Health Systems v. Edmondson*** 460 F.3d 1295, 1298 n. 6 (10th Cir. 2006). Therefore, I analyze the harm factors.

### B. Irreparable Injury

To establish irreparable injury for the purpose of a preliminary injunction, the plaintiffs must show that they will suffer irreparable injury, and that the irreparable injury is of such imminence that there is a clear and present need for equitable relief to prevent the harm. ***Heideman v. S. Salt Lake City***, 348 F.3d 1182, 1189 (10th Cir. 2003). It is reasonable to expect that this case will be resolved within 18 months, if not sooner. Thus, any injuries that might be suffered by the plaintiffs more than eighteen months from now likely are not injuries that are of such imminence that they may be considered in this analysis.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."

***Amoco Production Co. v. Village of Gambell, AK***, 480 U.S. 531, 545 (1987). It is helpful to recall the purposes of the NEPA and the roadless rule in analyzing the plaintiffs' claims of irreparable injury. The NEPA was passed by Congress to safeguard against environmental harms. ***Davis v. Mineta***, 302 F.3d 1104, 1114 (10th Cir. 2002). Harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure." *Id*. at 1115. The roadless rule was adopted with purposes similar to those of the NEPA. The roadless rule was designed to protect air and soil quality, habitat for threatened, endangered, or sensitive species, and public drinking water. 66 Fed. Reg. 3245 - 3247. Additionally, the roadless rule also is intended to provide opportunities for dispersed outdoor recreation, including hunting, fishing, camping, canoeing, and skiing. *Id*. at 3245. Considering these purposes, harm to the environment may be presumed when an agency fails to comply with the roadless rule. In the context of a motion for preliminary injunction asserting a violation of the NEPA and alleging environmental harm, the plaintiffs "must still make a specific showing that the environmental harm results in irreparable injury to their specific environmental interests." *Id*. Any applicable presumption of injury does not necessarily demonstrate irreparable injury.

The plaintiffs allege that construction of the Bull Mountain pipeline will disturb natural resources along more than eight miles of the pipeline's pathway through three inventoried roadless areas. Citing the FEIS, the plaintiffs note the following facts. The 100 feet wide right of way will be stripped of trees and other vegetation and graded to accommodate construction vehicles. The construction vehicles will excavate a trench for the pipeline that will be five to six feet deep and four to six feet wide. Nine acres of spruce/fir old growth and 29 acres of aspen old growth will be removed, and generally

11

trees will not be permitted to grow in the pipeline right of way.  Construction will increase erosion, and will change Canada lynx habitat from suitable to unsuitable.  The plaintiffs contend that these impacts will harm irreparably the members of the plaintiff organizations, who use the roadless areas for hunting, recreation, and wildlife viewing.  In addition, the plaintiffs assert that the construction will greatly disturb their members' opportunity for solitude in these remote wild lands.

Generally, the plaintiffs rely on the affidavit of Tony Prendergast to support their claim of irreparable injury.  *Motion for preliminary injunction*, Exhibit 4 (Prendergast Affidavit).  Prendergast is a member of both the Western Colorado Congress and of the Western Slope Environmental Resource Council.  Both of those organizations are named as plaintiffs.  Presumably, Prendergast's interests exemplify the interests of the other members of the plaintiff organizations.  Generally, Prendergast describes his use of and experiences in the roadless areas at issue here, and his plans to use these areas in the future.  Prendergast uses the areas for hunting, camping, and horseback riding.  He describes also how the construction of the pipeline would sour his experiences in the area and would, as a result, drive him away from the area.  *Prendergast Affidavit*, ¶¶ 12 -13.  Based on previous experiences, Prendergast opines that it would take about a decade for the pipeline right of way to revegetate with grass and forbs following construction.  *Id.*, ¶ 14.  In addition, he describes how the construction would disturb wooded areas, promote invasive weeds, and cause other environmental harm in the area.  *Id.*, ¶¶ 12 - 18.

In considering the nature of the harm described by Prendergast, I note that other areas are available where Prendergast and other members of the plaintiff organizations can enjoy similar experiences.  Prendergast makes oblique reference to this fact,

12

describing how he has seen "a huge swath of western backcountry" in his life. *Id*, ¶ 6. However, I conclude that the fact that Prendergast likely can enjoy similar experiences in other areas does not demonstrate that the harm he described is not irreparable. "As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." ***Pelfrense v. Village of Williams Bay***, 685 F.2d 877, 883 (7th Cir. 1989) (citation omitted).

The defendants argue that the injuries asserted by the plaintiffs are not irreparable because they are "insignificant, short-term, or will be reduced by design criteria and mitigation measures." *Federal defendants' opposition* [#24], filed April 8, 2008, p. 12. For example, the federal defendants note that the FEIS concludes that the pipeline's impacts to wetlands and water quality are expected to be small in scale and of short duration. *FEIS*, p. 149. The project would be a relatively small contributor to air quality emissions, potential effects would be short term, and the project would comply with air quality objectives. After construction the pipeline right of way would be reclaimed and vegetation would be restored. *SGI's opposition* [#26], filed April 8, 2008, Guinn Affidavit, pp. 3 - 6. The disruption of Canada lynx habitat would not be long-term because vegetation within the pipeline right of way will return over time. *FEIS*, p. 234.

In sum, I conclude that the plaintiffs have produced evidence that they will suffer some imminent and irreparable injuries if the pipeline construction begins. The defendants' counter-arguments are credible, but they do not demonstrate a lack of irreparable injury. Rather, the defendants' arguments generally demonstrate that the imminent and irreparable injuries claimed by the plaintiffs carry less weight than they would carry without the evidence cited by the defendants. Thus, on balance I conclude

that the plaintiffs will suffer some irreparable injury. Therefore, this factor weighs in favor of the plaintiffs.

### C. Balance of Harms

The balance of harms factor requires that I balance the irreparable harms established by the plaintiffs against the harms the defendants and the intervenor-defendant would suffer if an injunction were issued. The defendants, the BLM, and the Forest Service, argue that their interests are tied to the public interest. I agree with their assertion that the public has an interest in the continued drilling for and transport of natural gas from Forest Service and BLM lands. Presumably, that interest would be impaired by an injunction because an injunction would delay the completion of the pipeline, and, thus, delay the transportation of gas from wells that eventually would be served by the pipeline.

SGI, the intervenor-defendant, argues that a one year delay in the commencement of construction would cause it to suffer certain monetary losses. Again, construction is scheduled to commence as early as May 1, 2008. One such loss is the payment of a one million dollar payment SGI says it had to guarantee to assure that its pipeline contractor would remain available to begin work this year, despite the threat of litigation. At oral argument, the plaintiffs indicated that they had asked SGI to produce an agreement reflecting this obligation, and the SGI indicated that the guarantee agreement is an oral agreement. I disregard this claimed injury because the enforceability of such an agreement is highly doubtful.

SGI estimates that it will have to pay about $288,000 per year to store the pipe it has purchased to complete the project. In addition, SGI estimates that the net present value of its income stream that would be produced if it can transport gas that currently is

stranded at existing gas wells is 14 million dollars per year. These economic harms carry significant weight.

Considering the weight of the irreparable injuries established by the plaintiffs against the weight of the public interest in gas production, and SGI's demonstrated economic interests, I conclude that the balance of harms in this case is roughly a wash. Accordingly, this factor does not weigh heavily in favor of either the plaintiffs or the defendants.

### D. Public Interest

Addressing the public interest factor, SGI notes that the public interest in compliance with federal environmental statutes does not automatically supersede all other interests that might be at stake. **Amoco Production Co. v. Village of Gambell, AK**, 480 U.S. 531, 545 (1987). SGI otherwise relies on the defendants, as representatives of the public interest, to address this factor. The defendants note again that the federal government's policy is to foster and encourage mineral development. This policy is expressed generally in the Mining and Minerals Policy Act of 1970, 30 U.S.C. § 21a, and the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594. Under the Mineral Leasing Act, federal agencies may grant rights of way for pipelines to transport natural gas and to allow temporary use of federal lands for construction, operation, and maintenance of such pipelines. 30 U.S.C. § 185(a), (e). On the other hand, both the roadless rule and the NEPA expressly demonstrate a public interest in protecting the environment. Furthermore, the public clearly has an interest in requiring compliance with the requirements of these laws.

These public interests sometimes conflict, and they certainly conflict in this case. As a factor in my preliminary injunction analysis, I conclude that the public interest factor

does not weigh heavily in favor of either the plaintiffs or the defendants and the intervenor-defendant.

## V.  CONCLUSION

The plaintiffs have not demonstrated a substantial likelihood that they will prevail eventually on the merits of either their roadless rule claim or their NEPA claim. The harm factors do not tip decidedly in favor of the plaintiffs.  Therefore, I conclude that the plaintiffs have not shown that they are entitled to the preliminary injunction they seek.

## VI. ORDER

**THEREFORE, IT IS ORDERED** that the **Petitioners' Motion and Memorandum in Support of Motion for Preliminary Injunction** [#15], filed March 20, 2008, is **DENIED**.

Dated April 30, 2008, at Denver, Colorado.

**BY THE COURT:**

**s/ Robert E. Blackburn**
**Robert E. Blackburn**
**United States District Judge**